**In the Matter of GENESIS HEALTH VENTURES, INC., et al., Debtors.**

**No. 00–2692/JHW.**

United States Bankruptcy Court, D. Delaware.

Jan. 24, 2002.

---

Philip R. Michael, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, for R. Steven Scherfel.

Kathleen McDermott, Blank, Rome, Comisky & McCauley, LLP, Washington, DC, Michael F. Walsh, Weil, Gotshal & Manges, LLP, New York City, Co–Counsel for the Debtors.

### Opinion on Estimation of Claim of R. Steven Scherfel

JUDITH H. WIZMUR, Bankruptcy Judge.

On this motion for summary judgment, the debtors, including Genesis Health Ventures, Inc. ("Genesis") and Neighborcare Pharmacy Services, Inc. ("Neighborcare"), seek to estimate the proof of claim filed by R. Steven Scherfel ("claimant") at zero.[1]

The claimant is the principal of the Cherry Hill Convalescent Center

---

1. The parties agree that proofs of claim numbers 5697 and 5698 filed by the claimant have been expunged as duplicative, leaving proof of claim number 5696 remaining to be considered herein.

("CHCC") in Cherry Hill, New Jersey. Claimant's proof of claim, filed on March 14, 2001, is based on an allegation that the debtors violated the False Claims Act, 31 U.S.C. § 3729, *et seq.* The claimant asserts that the debtors, in their capacity as pharmaceutical providers, defrauded the Medicaid program by failing to credit Medicaid for pharmaceuticals ordered for Medicaid patients and returned to debtors and/or their predecessors for resale, not only in New Jersey, but in 16 other states as well.[2] Claimant asserts that the claim of the United States is $108 million, which may be trebled to $324 million.[3]

## FACTS AND PROCEDURAL HISTORY

West End Family Pharmacy, Inc., ("West End") a pharmaceutical provider operating in New Jersey, supplied pharmacy services to CHCC nursing home residents from 1987 through December 31, 1996. In 1992, West End was acquired by Vitalink Pharmacy Services, Inc. ("Vitalink"), a multi-state pharmaceutical provider, but continued to operate as West End. In 1998, Neighborcare acquired West End through a merger transaction involving Vitalink and Genesis, the parent company of Neighborcare.

The claimant contends that on or about December 9, 1996, shortly before the relationship between CHCC and West End terminated, a meeting was held between claimant Scherfel, Linda Lake, the assistant administrator of CHCC, Sam Veltri, Regional Vice President of West End,[4] and Harold Blumenkrantz, former owner of West End, to discuss an outstanding bill due to West End from CHCC for pharmacy services rendered to CHCC Medicare and private pay patients. To ascertain whether appropriate credits were being afforded to CHCC by West End for Medicare and private pay patients, Scherfel and Lake inquired about the manner in which West End afforded credits for returned drugs to the Medicaid program. According to Scherfel and Lake, Veltri responded that no credit was being afforded to Medicaid patients for the return to West End of unused pharmaceuticals. Scherfel and Lake recall that Veltri justified the failure to give credits on the ground that "no one in the industry"[5] provided such credits because the Medicaid reimbursement for drugs was "too low."[6]

CHCC was not directly involved in the administration of Medicaid funding for

2. Debtors' Motion for Summary Judgment, Exh. B (Relator's Objection to Proof of Claim of the United States of America. Ex Rel. R. Steven Scherfel) at ¶ 12.

3. The proof of claim is based on the amounts billed by the debtors and their predecessor to the Medicaid program during the years 1994 through 1999. In his submission, claimant contends that he intends to extend the proof of claim to include amounts allegedly wrongfully billed from 1990 through 1999. The question of the opportunity of the claimant to amend the proof of claim, and the related statute of limitations issue under the False Claims Act, are not dealt with herein.

4. At oral argument on January 2, 2002, the debtors were requested to submit an affidavit from Mr. Veltri detailing his position with the

company in December 1996. He did so, outlining that in 1996, he was employed by West End as the Regional Vice President, with operational and management duties only to West End within the State of New Jersey. Subsequent to the merger transaction with Neighborcare in 1998, Mr. Veltri became, and still serves, as Senior Vice President for the Mid Atlantic Region, with responsibilities for Neighborcare pharmacy operations in New Jersey and Eastern Pennsylvania. Certif. of Sam Veltri (Jan. 4, 2002).

5. Relator's Objections to Proofs of Claim, Exh. B (Motion for Summary Judgment) at ¶ 36.

6. T100–23, Linda Lake Deposition (Nov. 15, 2001).

pharmaceuticals purchased for Medicaid patients at CHCC. West End billed Medicaid for the drugs, and controlled their distribution at CHCC. West End supplied pharmaceuticals to CHCC patients by keeping stocked "pharmaceutics carts" utilized by CHCC staff to dispense drugs to patients. West End owned and controlled all carts and inventory.

Claimant contends that following the termination of the relationship on January 1, 1997, CHCC conducted an audit that revealed that West End did not properly credit returned pharmaceuticals on Medicare, private pay and private insurance programs. The claimant contends that the failure of West End to properly credit returned pharmaceuticals to other programs provides a basis to infer that West End failed to properly credit returned pharmaceuticals to Medicaid.

In 1999, the debtors filed a complaint in Superior Court of New Jersey, against CHCC, claiming amounts due to West End for pharmacy services during the contractual term between the parties which ended on or about January 1, 1997, to which CHCC counterclaimed on various grounds.[7]

On March 10, 2000, the claimant filed a qui tam action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* in the United States District Court for the District of New Jersey. On March 8, 2001, the United States declined intervention. The complaint was partially unsealed and served on the defendants in July 2001.

On September 20, 2001, this court entered an order confirming the debtors' plan of reorganization. The debtors have reserved the claimant's proof of claim, in the amount of $ 324 million, thus precluding full distribution to Class G 4 unsecured creditors under the plan. It was determined that the claim would be estimated under 11 U.S.C. § 502(c) to fix the amount of the allowed claim, and to permit distribution to be made to allowed claims in accordance with the confirmed plan. The debtors move herein for summary judgment to estimate the claim at zero.

## DISCUSSION

■ The False Claims Act, 31 U.S.C. § 3729, *et seq.,* provides in pertinent part that any person who

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government ...

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person,

with certain exceptions. The terms "knowing" and "knowingly" as used in the statute do not require proof of specific intent to defraud the government, 31 U.S.C. § 3729(b)(3), but require that the defendant have "actual knowledge of the information," or act "in deliberate ignorance of the truth or falsity of the information," or act "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). *See* W. JAY DEVECCHIO, *Qui Tam Actions: Same Practical Con-*

---

7. The debtors filed an adversary proceeding in this case on or about April 5, 2001 against CHCC, in which a claim for $128,435.40 is asserted by the debtors against CHCC. Adv. No. A–01–923.

*siderations,* SG013 ALI–ABA 399, 402 (2001). The private citizen plaintiff, referred to as the "realtor", brings the cause of action, commonly known as a qui tam action, on behalf of the United States, and is entitled to a percentage of any recovery from the defendant. 31 U.S.C. § 3730(b). *See also Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir.2001).

The claimant's qui tam action under the False Claims Act is based on the premise that the debtors and their predecessor, West End, knowingly failed to credit Medicaid for unused pharmaceutics which were returned to the debtors and resold either to Medicaid patients or patients funded by other programs. The debtors contend that the claim must be estimated at zero, because it has no legal merit. According to the debtors, neither the federal nor New Jersey Medicaid agencies have promulgated any regulation or reimbursement policy relating to the return of unused medications that can support a violation of the False Claims Act. Nor has the claimant provided a sufficient factual basis to warrant further investigation regarding the debtors' Medicaid credit methodologies in other jurisdictions. A review of the statutory, regulatory and policy framework of the Medicaid program, and the factual record presented by the claimant, compels the conclusion that the debtors are correct, i.e., that there is no statutory, regulatory or policy basis upon which a False Claims Act violation can be premised in the state of New Jersey, and that there is insufficient basis to extend the inquiry to other jurisdictions.

1. Medicaid Statutory and Regulatory Framework.

The Medicaid program, referenced at 42 U.S.C. § 1396 *et seq.,* is designed to provide medical assistance to qualifying indigent or low income children and adults not covered by other health care programs such as Medicare. Medicaid services are jointly financed by the state and federal governments, and administered by the states through the designation of a single state agency. In New Jersey, the Division of Medical Assistance and Health Services ("DMAHS") is the designated state agency. The federal agency responsible for oversight of the Medicaid program is the Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"). The obligations and responsibilities of health care providers who participate in Medicare and Medicaid services are generally established by federal and state regulations, and by provider agreements with each respective program in each jurisdiction of operation.

The applicable federal statute requires states to adopt regulations which must "provide such methods and procedures relating to the utilization of, and the payment for, care and services under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). No provisions are contained in the applicable federal Medicaid regulations regarding reimbursement requirements or credits for returned drugs. 42 C.F.R. 447.331 through 334. The New Jersey Medicaid statute, N.J.S.A. 30:4D–12(b), provides in pertinent part that payments may not be "in excess of reasonable charges ... consistent with efficiency, economy and quality of care." No Medicaid regulation has been promulgated in New Jersey requiring the processing of credit for unused medication. *See* N.J.A.C. 10:51–2.1 *et seq.,* (entitled "Pharmaceutical Services to Medicaid or NJ KidCare Fee for Services Beneficiaries in a Nursing Facility"). The only specific

regulatory references have been to N.J.A.C. 8:39–29.4(j),[8] contained in the New Jersey Long Term Care Manual, suggesting that nursing homes should have a credit mechanism policy, and N.J.A.C. 13:39–7.10 [9] and 9–15,[10] which specify certain requirements for the return and disposal of drugs in a hospital setting. These regulations do not address the issue of credits to be afforded to the funder for returned medications.

Nor has our attention been drawn to any provisions of the Provider Agreement between West End and the DMAHS,[11] or to any official written policies of the state, requiring such credits. To the contrary, we are directed by the debtors to correspondence dated December 14, 1998, from a representative of the DMAHS concerning a qui tam action filed against a pharmaceutical provider, confirming that there is no such regulation in New Jersey. The representative, Edward J. Vaccaro, Assistant Director of the Office of Health Service Administration within the DMAHS, wrote as follows:

1. DMAHS does not regulate the crediting or return of unused medications dispensed to nursing facility beneficiaries. Providers of nursing facility pharmacy services voluntarily credit the State of New Jersey for costs related to initially dispensed then returned prescriptions. I am unaware of credit provided by Medicaid for controlled drugs and destroyed medications.

2. Regulations governing the crediting of unused medications in nursing facilities are promulgated by the Department of Health and Senior Services (DHSS)....

3. Based on my discussion with Mr. Crocker on December 3, 1998, these regulations may be found at N.J.A.C. 8:39–29.4(j).

---

**8.** N.J.A.C. 8:39–29.4. Mandatory Pharmacy Control Policies and Procedures.

(j) Where allowable by law, the facility shall generate a crediting mechanism for medications dispensed in a unit-of-use drug distribution system, or other system that allows for the re-use of medications. The crediting system shall be monitored by the provider pharmacist and a facility representative.

**9.** N.J.A.C. 13:39–7.10. Return of Prescription Medication.

(a) No prescription medication shall be placed in stock for reuse or resale which has been returned after dispensing to a patient, except as provided in N.J.A.C. 13:39–9.15(a)2.

(b) Notwithstanding the provisions of (a) above, prescription medication incorrectly dispensed to a patient shall be accepted for return by the pharmacist and shall not be placed back in stock for reuse or resale.

**10.** N.J.A.C. 13:39–9.15 Disposal of Unused Medications.

(a) Written policies and procedures governing unused medications shall be established and implemented by the registered pharmacist-in-charge and shall comply with the following requirements:

1. All medications where the drug source, control number of expiration date are missing, shall be sent to the pharmacy for final disposition, or shall be disposed of by the health care facility according to its written protocol.

2. If a unit dose packaged medication has been stored in a medication room or secure area in the institution and the medication seal and control number are intact, the medication may be recycled and re-dispensed.

3. Any and all medication returned by outpatients of the facility shall not be redispensed.

4. The record of disposal of unused or nonadministered dispensed controlled dangerous substances expended or wasted either by accident or intent shall be signed and cosigned and witnessed by a licensed nurse, physician or pharmacist and disposed of by the health care facility according to its written protocol.

**11.** Debtors' Motion for Summary Judgment, Exh. C.

4. Although we do not regulate the return of unused medications, there is still a potential for fraud related to the provider's decision to *reissue* unused medications and to *bill Medicaid a second time* for the full cost of such medications.

. . . .

6. ... I am unaware of federal and Sate regulations requiring that any unused pharmaceuticals be properly credited to Medicaid.[12]

While paragraph 4 of Mr. Vaccaria's letter suggests "a potential for fraud" if returned medications are rebilled to Medicaid, there is a simple and direct recognition that the crediting and return of unused medications are not regulated in New Jersey.

Our attention is also drawn by the debtors to a 1985 memorandum from the Office of Inspector General ("OIG") for the Department of Health and Human Services.[13] The OIG issued an audit report in that year, opining that credits to Medicaid should be required where state pharmacy policies and procedures permit the return and redispensing of prescription drugs. Seven states were identified as places where such returns are permitted. The report stated that federal regulations are "silent regarding recovery by pharmacies of reusable drugs", and that the regulations "do not require that ... appropriate credits be made to Medicaid if the drugs are recovered."[14] The audit report recommends that federal regulations should specify that credits be given where the return and reuse of drugs is permitted. In response to the report, the HCFA (now CMS), the federal agency responsible for oversight of the Medicaid program at the time, opined that a regulatory amendment was not necessary, and that appropriate Medicaid credits could be afforded by contacting states that were not requiring such credits. The import of this audit report, albeit nominal in the context of the controversy presented here, particularly in light of the fact that the report was drafted 16 years ago, is to confirm that the federal regulations do not specifically provide for credits to Medicaid, but that such credits are appropriate and should be required.[15]

In the Vitalink Pharmacy Policy and Procedures for Pharmacy Operations, originally issued November 30, 1995, and revised June 14, 1998, provision is made in Section 1.14.1 for processing credits for returned products. For Medicaid patients, Vitalink employees are directed to "refer to state regulation", with a footnote reflecting that "If the State regulations are silent regarding the treatment of returned products and processing credit, the products are to be returned to facility for destruction and no credit is to be processed. If the State allows an option, the products should be returned to facility for destruction and no credit processed. If state requires crediting, insert copy of this regulation in manual."[16] Thus, the corporate policy of Vitalink, which appears to have been continued by Vitalink's successor, Neighborcare, is to adhere to the applicable state regulation regarding Medicaid credits.

2. The Claimant's Position.

The claimant supports his claim that the debtors failed to credit Medicaid for re-

---

12. *Id.* at Exh. G.

13. Debtors' Motion for Summary Judgment, Exh. F.

14. *Id.*

15. In the audit report of the OIG, New Jersey is listed as permitting returns of unused drugs and requiring Medicaid credits. As noted above, no such specific New Jersey regulation has been found.

16. Debtors' Motion for Summary Judgment, Exh. E.

turned medications, in violation of the False Claims Act, in New Jersey and 16 other states, on various grounds. First, the claimant contends that the federal statutory requirement that "payments are consistent with efficiency, economy and quality of care", and the state statutory requirement that charges not be "in excess of reasonable charges" are violated when a provider does not provide a credit to Medicaid for a return of medication already paid for by Medicaid, and/or requires duplicate payment for the same product if it is resold, at the expense of the United States.

Second, the claimant contends that Veltri's statement in December 1996 that his company does not provide credits to Medicaid for returned medications was unequivocal and clear. The claimant contends further that Veltri, by his comments, not only spoke for West End, which provides pharmaceutical services to several facilities in New Jersey, but also spoke for other Vitalink companies in New Jersey and in other states. Further, claimant contends that when Neighborcare acquired Vitalink in 1998, Neighborcare and its parent, Genesis, endorsed the business practice of West End and "implemented or permitted this same fraudulent business practice [deliberate and intentional failure to credit Medicaid for returned drugs] in each and every entity under its control, including but not limited to Neighborcare, ... [and that] Debtor's/Defendant's fraudulent business practice continues to the present and pervades their entire pharmaceutical operations." [17]

Third, the claimant contends that the payments made by debtors to Medicaid on account of credit for returned drugs by the debtor are "suspicious", and represent an "attempt by Genesis to cover its incriminating tracks after ... it became fully versed in the details of the *qui tam* Complaint that was officially served upon it on July 5, 2001." [18] In New Jersey, checks were written in 1999 by Neighborcare for two New Jersey pharmacies other than West End, for credits due for the period July 1998 through April 1999. No other checks were apparently written for credits to Medicaid until August 30, 2001. Checks were written on that date on behalf of four New Jersey pharmacies, including West End, for the periods from June 2000 through March 2001. On October 11, 2001, an additional check was written for April 2001 through June 2001. Following the entry of an order confirming the debtors' plan of reorganization on October 2, 2001, a check was written by Neighborcare for payment on behalf of accruals of Medicaid credits for returned drugs for the periods from pre-April 2000, through April, May and June 2000. According to the claimant, the debtors' "herky-jerky check writing strategy ... endeavor[s] to create after-the-fact evidence to dilute the *qui tam* case." [19]

Fourth, the claimant contends that the Debtors' failure to provide proof of payments to Medicaid as credits for returned medications in other jurisdictions, in response to the claimant's discovery requests, confirms that the debtors failed to make such payments, and violated the False Claims Act thereby. On November 5, 2001, in an internal memorandum, a

17. Debtors' Motion for Summary Judgment, Exh. B (Relator's Objection to Debtors' Objection to Proofs of Claim of the United States of America, ex. rel. R. Steven Scherfel) at ¶¶ 39 and 40.

18. Creditor/Relator's Memorandum of Law in Opposition to Debtors' Motion for Summary Judgment Re: Estimation of Proof of Claim 5696 at 8.

19. *Id.* at 7.

representative of the debtor, who was presumably responding to the claimant's discovery demands, requested debtors' employees to provide "[c]opies of checks and related payment support for all payments made to the State Medicaid agencies (or their intermediaries) since 9–1–98" for nine states, including New Jersey, Wisconsin and Maryland.[20] In addition to the checks provided for New Jersey, several checks were presented for Wisconsin and Maryland. The payments were sporadic. No payment support was supplied to the claimant for any of the other states.

3. Motion for Summary Judgment.

The debtors seek summary judgment on this record, asserting that there is no genuine issue as to any material fact, and that they are entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993); *Hampton v. Borough of Tinton Falls Police Dep't,* 98 F.3d 107, 112 (3d Cir.1996); *Gottshall v. Consolidated Rail Corp.,* 56 F.3d 530, 533 (3d Cir.1995). The party seeking summary judgment "bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has offered its initial proofs, the burden shifts to the non-moving party to establish that there is a genuine fact issue for trial. *Id.* at 324, 106 S.Ct. at 2553. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Id. See also Olson v. General Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir.1996) (nonmovant must provide more than mere allegations). The evidence offered must be of sufficient quantum and quality to allow a rational and fair minded fact finder to return a verdict in favor of the nonmovant, bearing in mind the applicable standard of proof that would apply at a trial on the merits. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Lawrence,* 98 F.3d at 65.

The record is "'viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. To satisfy his burden, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. at 1356. *See also Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1001 (3d Cir.1994). He must come forward with specific facts showing that there is a genuine issue for trial. *Id.* Thus, if the non-movant's evidence is "merely colorable" or is "not significantly probative," we may grant summary judgment. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

Viewing the record in the light most favorable to the claimant, and drawing all justifiable inferences in his favor, I premise the discussion of the estimation of the

20. *Id.* at Exh. 11.

claimant's qui tam action on the fact that as of December 1996, Sam Veltri, as Regional Vice–President of West End, acknowledged to the claimant that West End did not afford credit to Medicaid for returned drugs that were resold by West End in New Jersey.

 The necessary elements of a False Claims Act cause of action, as well as the "certification theory" of liability as a basis for False Claims Act relief, are explained in the recent Second Circuit case of *Mikes v. Straus,* 274 F.3d 687 (2d Cir.2001). In *Mikes,* the court rejected the relator's assertion that a group of doctors submitted false reimbursement requests to the federal government, in violation of the False Claims Act, because they failed to calibrate certain diagnostic equipment properly and failed to supervise the administration of diagnostic tests effectively, rendering the results so unreliable as to be "false" under the Act. The court explained that to impose liability under 31 U.S.C. § 3729(a)(1)[21], the claimant "must show that the defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Id.* at 695. *See also Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir.2001) (using the same factors in a three part test). For purposes of this discussion, we assume that elements 1, 2 and 5, that the debtors' failure to credit Medicaid for returned drugs constitutes a "claim", to the United States, which seeks payment from the U.S. Treasury, have been established. The focus is on the third and fourth elements, i.e., whether the claims were false or fraudulent, and whether they were made by the debtors knowing of the falsity of the claim.

 Whether a claim is "false or fraudulent" is not defined in the Act.

A common definition of "fraud" is "an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." Webster's Third New International Dictionary 904 (1981). "False" can mean "not true," "deceitful," or "tending to mislead." *Id.* at 819. The juxtaposition of the word "false" with the word "fraudulent," plus the meanings of the words comprising the phrase "false claim," suggest an improper claim is aimed at extracting money the government otherwise would not have paid. *Id.* at 696. A basic premise of the definition is some wrongful activity on the part of the defendant, whether it be an intentional misrepresentation, concealment, nondisclosure or deceit. *See U.S. ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 741 (3d Cir.1997) (fraud includes "a set of misrepresented facts [that] has been submitted to the government"). Here, in the absence of clear federal or state statutory or regulatory authority to support the contention that credits to Medicaid for returned or unused drugs is required, allegations of wrongdoing on the debtors' part must fail.

In reaching the conclusion that neither federal nor state statutes specifically require such credits, I have scrutinized the federal Medicaid statute requiring payments to be consistent with "efficiency, economy, and quality of care", 42 U.S.C. § 1396a(a)(30)(A), and the state statute

___

**21.** The Second Circuit noted that their analysis applies equally to 31 U.S.C. § 3729(a)(1), (2) and (3). *Id.* at 695. In this case, the claimant appears to be relying on subdivisions (1) and (2).

that payments must not be in excess of "reasonable charges", N.J.S.A. 30:4D–12(b). A reasonable argument can be made that if the recipient of a government payment for goods provided receives the goods back, to charge the government twice, when the drug is resold, would not be consistent with efficiency or economy, and would be in excess of reasonable charges. In fact, the debtors acknowledge that returns should be credited back as a matter of corporate policy. However, the fact that there are significant differences among the states on the subject of credits belies any conclusion that the debtors have an enforceable legal obligation to provide credits for returned drugs to Medicaid. The claimant and the debtors agree that some states do not permit any returns of medications.[22] Other states allow some medications to be returned [23], but require some drugs to be destroyed, either by the provider or by the recipient.[24] Some states require credit to be afforded [25], but there may be variations in the timing of the credit, the amount of the credit and the manner in which the credit may be afforded.[26] For instance, credit may be required only for the ingredient costs of drugs, which apparently recognizes the inherent administrative and distribution costs incurred by a provider in supplying the drug, and then processing its return. The variation among the states in applying the federal and state statutory and regulatory mandates negates the opportunity to conclude that in the state of New Jersey, where there is no specific regulatory direction regarding credits, the debtors' conduct in failing to provide credits to Medicaid in the state of New Jersey constituted a "false or fraudulent claim" within the meaning of the False Claims Act.

It is generally recognized that "a false claim may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation." S.Rep. No. 345, 99th Cong., 2d Sess., U.S.Code Cong. & Admin.News pp. 5266, 5274 (July 28, 1986). Courts have analyzed False Claims Act liability on a "certification theory", which includes legally false certifications, both express and implied, and factually false certifications. *Mikes*, 274 F.3d at 696–99. A claim is legally false under the False Claims Act only where a party certifies compliance with a statute or regulation as a condition to governmental payment. An implied false certification assumes that the act of submitting a claim for reimbursement itself implies compliance with governing fed-

---

**22.** *See, e.g.,* Michigan, Mich. ADC R. 338.472; Mississippi, 50 018 CMSR 001, Art. XI, 4; New Mexico, N.M.A.C. 16:19.6.14 (prohibiting the return of drugs which leave the premises where sold or distributed).

**23.** Some states allow returns with certain restrictions. *See, e.g.,* Florida, 64 FL ADC 64B16–28.118; Georgia, GA ADC 480–10–.17; Idaho, IDADC 27.01.01.15; Illinois, Ill. ADC 725.70; Iowa, IA ADC 657–23.14(124, 155A); Maryland, MD ADC 10.34.10.07; Minnesota, Mn ADA 6800.2700; North Dakota, N.D. AC § 61–04–01–01; Rhode Island, 14 130 CRIR 001, § 8.2; South Dakota, SD ADC 20:51:13:02.

**24.** *See, e.g.,* Illinois, Ill. ADC 1510.50 (opened, damaged or outdated prescriptions to be destroyed); North Dakota, N.D. AC § 61–09–02–01 (unused portions are to be destroyed).

**25.** Claimant contends, on page 2 of his affidavit dated January 8, 2002, that nine of the states listed in the qui tam complaint "have specific provisions concerning credits owed to Medicaid for re-packaged and re-sold medications", but the claimant does not provide any specific references to these provisions.

**26.** *See, e.g.,* Connecticut, C.G.S.A. § 17b–363a; Nevada, NVRS 639.267; Missouri, 13 Mo. ADC 70–20.050; South Dakota, S.D. ADC 20:51:13:02:01.

eral statutes or rules as a precondition to payment. The notion of implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states that the provider must comply in order to be paid. *Id.* at 700. *See also Shaw v. AAA Engineering & Drafting, Inc.,* 213 F.3d 519, 531–32 (10th Cir.2000). For instance, the Medicare provision, 42 U.S.C. § 1395y(a)(1)(A) states that "no payment may be made under [the Medicare statute] for any expenses incurred for items or services—which … are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Another example of express compliance as a condition of payment is a section of the New Jersey Medicaid statute which states that "providers who render health care services shall not be entitled to reimbursement for the services rendered unless set services are documented pursuant to subsection (d) of this section [requiring the maintenance of individual patient records]" N.J.S.A. 30:4D–12(e). In contrast, the applicable federal and state Medicaid statutes do not specify that the provider must provide credits to Medicaid for returned drugs in order to be paid. The federal statute on which the plaintiff relies, 42 U.S.C. § 1396a(30)(A), requires states to adopt regulations to ensure that payments are consistent with efficiency, economy and quality of care. The state statute upon which plaintiff relies, N.J.S.A. 30:4D–12(b), directs the state agency to assure that payments may not be in excess of reasonable charges. No specificity regarding the provision of credits for returned drugs to Medicaid as a condition for payment to a provider are contained in these provisions. Therefore, the claimant's cause fails under the "legally false certification" theory.

A "factually false" certification "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes,* 274 F.3d at 698. To establish False Claims Act liability on the basis of a factually false certification, it is necessary to show that the defendant knowingly submitted such a claim, i.e., possessed actual knowledge, acted in deliberate ignorance of the falsity of the claim, or acted in reckless disregard of the falsity. 42 U.S.C. § 3729(b). A claim is not fraudulent if there is an accounting mistake. The requisite scienter must be shown to support the claim. *Mikes,* 274 F.3d at 703. Here, there is no question that West End ordered the drugs for which payment was received, supplied the drugs to CHCC, administered the distribution of the drugs to patients, collected the unused drugs, returned the unused drugs to West End, destroyed some drugs, repackaged some drugs, and resold some drugs. Were products supplied and services performed? The answer is emphatically "Yes". Did West End knowingly or recklessly contend otherwise? The answer is "No". In this murky area in which no specificity exists in the statutory, regulatory or contractual scheme regarding the provision of credits, with no quest by either the state or federal government for unpaid credit, either by way of the filing of proofs of claim or otherwise, there is insufficient basis to charge the debtors with the requisite scienter required to establish a factually false certification.

Contrary to the claimant's contention, the so-called "suspicious" payments made by the debtors post-petition and post-confirmation do not impute the requisite scienter upon the debtors. The debtors filed their Chapter 11 petitions on June 22, 2000. In August 2001 and October 2001, postpetition accruals of Medicaid credits for returned drugs were paid by

the debtors. Following the entry of an order of confirmation, on October 25, 2001, the debtors made payments toward pre-petition Medicaid credits for returned drugs. Even if we assume that the debtors made those payments in direct response to the pendency of the claimant's qui tam action to demonstrate that payments toward Medicaid credits were being made, that motivation does not impose upon the debtors the type of fraudulent intent to deceive, or reckless disregard of falsity, required to constitute a factually false certification. While it is accepted as a fact that West End failed to pay Medicaid for returned drugs that were resold in the state of New Jersey, I conclude that failure does not constitute a False Claims Act violation as a matter of law.

■ The debtors' liability for False Claims Act violations in all other jurisdictions in which Vitalink operated in December 1996 is premised upon the assumption that when Sam Veltri stated to Scherfel and Lake that no credits were being afforded to Medicaid for returned drugs, he was speaking for "the entire company", beyond the state of New Jersey. As well, claimant contends that when Vitalink was acquired by Genesis and Neighborcare in August 1998, Genesis endorsed the business practices of Vitalink, continuing the failure of the company to provide Medicaid credits for unused drugs.

The only competent evidence in the record regarding Sam Veltri's position of employment in December 1996, and the actual scope of his statements on that day, is the certification he submitted, dated January 7, 2002, in which he affirms in relevant part as follows:

3. In 1996, I was employed by West End Family Pharmacy, located in Ocean, New Jersey, as the Regional Vice–President. West End Family Pharmacy was part of the Vitalink Company through an acquisition that occurred in 1992. My responsibilities included the management of Vitalink pharmacy business in New Jersey. The only pharmacy under my responsibility was West End Family Pharmacy and I did not have operational or policy duties with any other pharmacy in New Jersey or any other State. Attached hereto as Exhibit A is an organizational chart for West End Family Pharmacy in March and December, 1998, identifying my position.

4. In 1996, I had several discussions with R. Steven Scherfel, the principal of Cherry Hill Convalescent Center ("Cherry Hill"), regarding Cherry Hill's outstanding accounts receivable of over $250,000. West End provided pharmacy services to Cherry Hill and Cherry Hill was obligated to pay for those services.

5. During these discussions, Mr. Scherfel, and the controller for Cherry Hill, Ms. Linda Lake, sought information regarding West End's billing and pricing practices, including any credits due for medication returns. Some of these communications were in writing and are attached hereto as Exhibit B. All written communications are on West End Family Pharmacy letterhead.

6. In these discussions, I advised Mr. Scherfel and Ms. Lake of West End's pricing, billing and return medication credit policy. I was not asked, and made no representations of, operations or policies for Vitalink pharmacies other than West End. I did not provide any information on Vitalink operations or policies in other pharmacies in New Jersey or any other State.

Exhibit B appended to Mr. Veltri's affidavit is a letter he wrote to Linda Lake at CHCC, dated December 13, 1996, on "West End Family Pharmacy" stationary,

reflecting the notation that West End was "A Vitalink Company".

The issue of Vitalink's liability in other jurisdictions as of December 1996 focuses on whether, at the December 9, 1996 meeting, when Veltri acknowledged that no Medicaid credit was being given for returned drugs, Veltri was speaking on behalf of a multi-state Vitalink operation, or only representing West End and its limited New Jersey operations. Against Veltri's direct affirmances, under oath, in his affidavit, that he was not asked, and made no representations about the operations or policies of Vitalink pharmacies other than West End, and did not provide any information on Vitalink operations or policies in other pharmacies in New Jersey or any other state, the claimant recites references to his deposition and the deposition of his administrative assistant, Linda Lake, the letter of December 13, 1996 referenced above, and a letter dated November 8, 1999 from Genesis counsel to CHCC. None of these references provide competent information to pose a factual dispute with Veltri's direct and unequivocal statements.

In Scherfel's deposition, conducted on November 15, 2001, Scherfel's "impression" was that Veltri was with Neighborcare as of December 1996.[27] He acknowledges that Veltri "didn't reference any particular state" in the course of the discussion.[28] "He was a regional vice president and said that as a corporate policy they don't credit Medicaid at all because the reimbursement is too low and they don't make enough money."[29] Scherfel testified that he assumed that Veltri's comments applied beyond the state of New Jersey "[b]ecause of his title as regional vice president and the way he implied giving the statement that it was a corporate-wide policy."[30] As reflected in the deposition, Scherfel's beliefs regarding Veltri's position were based on unfounded assumptions and implications, including the erroneous belief that Neighborcare may have been involved. Claimant acknowledges in its own submissions that Neighborcare did not acquire Vitalink and West End until August 1998, nearly two years following the Veltri meeting. *See, e.g.,* Creditor/Relator's Memorandum of Law in Opposition to Debtors' Motion for Summary Judgment Re: Estimation of Proof of Claim 5696, Exh. 6 (Profile of Vitalink Pharmacy, 1967–1998). The letter of December 13, 1996, reflecting that West End was "a Vitalink company" does not allow us to infer that any statements Veltri made would apply to the entire Vitalink operation. The 1999 letter from Genesis counsel is also irrelevant, shedding no light at all on who Veltri spoke for in his comments on December 9, 1996.

The same is true of Linda Lake's deposition. She acknowledged that in December 1996, she did not know "who Sam Veltri actually worked for",[31] but "understood" Veltri's comments to encompass "all Medicaid programs, all their facilities, everything they did", because "he did not specify differently."[32] As Ms. Lake explained it,

> Mr. Veltri, as I understood it, was not just a New Jersey person.... He was more of a corporate level and speaking more on a corporate level, a more global sense.[33]

27. T11–19.

28. T76–10 to 11.

29. T76–12 through 16.

30. T76–20 through 23.

31. T91–15 to 16 (Nov. 15, 2001).

32. T143–14 to 17.

33. T144–3 to 8.

Both Scherfel and Lake relied in their depositions on assumption, speculation, belief and "understanding", with no other basis for their assumptions that Veltri's comments about Medicaid credits referred to Vitalink operations beyond West End. In fact, neither in the depositions nor in Scherfel's more recent affidavit is there any suggestion that Veltri actually stated that his comments were applicable to any entity but West End. As reflected above, to defeat Veltri's assertion that he spoke only for West End, the claimant must produce evidence that is more than "merely colorable" or "not significantly probative", *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11, and must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric,* 475 U.S. at 586, 106 S.Ct. at 1356. This claimant has failed to do that.

In his most recent submission, the claimant contends that Veltri's affidavit leaves unanswered questions, including Veltri's position, if any, with Vitalink prior to 1996, and whether Vitalink's policies regarding Medicaid credits differed in other places from the West End policies. He argues that an evidentiary hearing should be held "to consider what the Claimant believes are non-responsive submissions, half-truths and self-serving, undocumented declarations by the Debtors." Letter of January 10, 2002 at 1. The claimant's "beliefs" are irrelevant. When a supporting affidavit based on personal knowledge is filed in support of a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). It is not enough to raise questions about the contents of the affidavit, or to contend that the affidavit contains "half-truths". The claimant has the burden to establish that there is a genuine fact issue for trial on whether Veltri was speaking for the multistate Vitalink operation, and has failed to meet that burden on this record.

The claimant has also failed to produce a sufficient factual basis to support his contention that after the acquisition of Vitalink and West End in 1998, the debtors endorsed the improper business practices of West End by failing to credit Medicaid for returned drugs in sixteen other jurisdictions. At their depositions, both Scherfel and Lake acknowledged that the only "evidence" they had about the Medicaid of NeighborCare and its parent, Genesis, was the 1996 statement of Veltri regarding West End, made nearly two years before NeighborCare had any involvement with West End, and the debtors' lack of responsiveness to the claimant's requests for discovery regarding Medicaid credits afforded by the debtors for returned drugs in other jurisdictions. The claimant contends that the few checks presented by the debtors from the states of Wisconsin and Maryland, together with the internal memorandum directed to debtors' employees in six other jurisdictions requesting evidence of payments to Medicaid, with no response, is sufficient to require the debtors to produce additional discovery, particularly since information about credits to Medicaid in other jurisdictions is exclusively in the hands of the debtors.

▆▆▆ The debtors correctly contend that false claims suits brought by private citizens are not accorded any special protections from the Federal Rules of Civil Procedures. *See, e.g., U.S. ex. rel. Detrick v. Daniel F. Young, Inc.,* 909 F.Supp. 1010 (E.D.Va.1995). Where a potential relator suspects that " 'there's something fishy going on in connection with Government

Contract A and Contractor B[,]' [t]his is not enough to file a fraud complaint, and it is not enough to earn *qui tam* relator status." *Id.* at 1022. The *Detrick* court reflected that while the False Claims Act is designed to encourage citizens with actual knowledge of fraud to come forward, the Act was "plainly not designed to result in government agencies pursuing fishing expeditions at the behest of suspicious citizens." *Id.* Similarly, a relator may not have unfettered opportunity, based on a suspicion of fraud, to pursue a fishing expedition.

In this case, the claimant has no competent basis upon which to investigate the Medicaid credit methodologies and operations of the debtors in other jurisdictions.[34] His suspicions, or his belief that "there is something fishy going on," is insufficient.

For the reasons advanced, the debtors' motion for summary judgment to estimate claimant's proof of claim No. 5695 at zero is granted.[35] Debtors' counsel shall submit a form of order in conformance herewith.

---

**34.** The claimant contends that several documents remain under seal with the United States District Court, and that those documents may provide support for the claimant's contentions. One such document is the audit report conducted by CHCC, which seeks to establish that Medicaid was not properly credited for return drugs in the state of New Jersey by the debtors' predecessors. I have accepted as a fact that Medicaid credits were not afforded by West End on behalf of CHCC Medicaid patients. Another document which remains under seal is a "disclosure statement," which the claimant contends contains "[c]ertain information relevant to the business relationship between Sam Veltri and the Vitalink Company." Scherfel Affidavit at 3 (Jan. 8, 2002). However, any such information would presumably be within the knowledge of Scherfel and Lake, neither of whom

have offered that knowledge as part of the record. I note that in their depositions, neither Scherfel nor Lake were able to provide any information about Veltri's position with West End and/or Vitalink, or any factual bases for their "suspicions" regarding Medicaid credits in any state. *See, e.g.,* T145–6 through T149–17, Deposition of Linda Lake (November 15, 2001); and T71–1 through T73–6, Deposition of R. Steven Scherfel (November 15, 2001).

**35.** Questions raised by the submissions and at oral argument regarding the successor liability of Genesis and NeighborCare for liabilities incurred by West End and Vitalink need not be addressed in light of my conclusions that neither entity bears False Claims Act liability in this case.