NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3348
_____

JAMEL BILLUPS; JACQUELINE ROSARIO;
T.R., a minor; and L.B., a minor,
                                        Appellants

v.

PENN STATE MILTON S. HERSHEY MEDICAL CENTER;
MARK S. DIAS, M.D.; KATHRYN R. CROWELL, M.D.; ARABINDA K.
CHOUDHARY, M.D.; KATHLEEN D. EGGLI; FRANKLIN COUNTY;
KARI COCCAGNA; MINNIE TUNER
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-11-cv-01784)
District Judge: Honorable Yvette Kane
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 4, 2018

Before: HARDIMAN, KRAUSE, and BIBAS, *Circuit Judges*.

(Filed: September 12, 2018)
_____

OPINION[*]
_____

_____

   [*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does
not constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Jamel Billups and Jacqueline Rosario temporarily lost custody of their two minor children as a result of an investigation into the potential abuse of their four-month-old daughter L.B. They appeal a summary judgment of the District Court in favor of three doctors involved in their daughter's treatment (the Medical Defendants), as well as Franklin County and two of its employees (the County Defendants). Like the District Court, we perceive no reversible error in Magistrate Judge Saporito's well-reasoned and thorough report and recommendation. Accordingly, we will affirm.

I

In October 2009, Rosario and Billups took L.B. to the emergency room at Chambersburg Hospital after L.B. suffered a stroke. Testing revealed that L.B. had a subdural hemorrhage, a possible skull fracture, and multiple rib fractures. L.B. was airlifted to Penn State Hershey Medical Center (HMC) for further treatment, and Chambersburg Hospital staff informed both Franklin County Children and Youth Services (CYS) and local police that they suspected she was abused. CYS filed a dependency petition and obtained an ex parte order granting the County temporary custody over both L.B. and the couple's other daughter, T.R. A few days later, Billups was charged with aggravated assault and endangering the welfare of a child and was incarcerated pending trial.

While the criminal case was pending against Billups, a CYS caseworker issued the parents a Family Service Plan, which laid out the reunification goals they needed to complete before custody could be restored. After a hearing, the Court of Common Pleas

of Franklin County found clear and convincing evidence that Billups had physically abused L.B., and it ordered Billups to have no contact with the children until further court order. Rosario appealed, the Superior Court of Pennsylvania affirmed, and the Pennsylvania Supreme Court denied allocatur. On February 15, 2010, Rosario regained physical custody of L.B. and T.R. after CYS documented her progress toward meeting the reunification goals. Rosario remained under the supervision of CYS for about two months more, until the Franklin County Court terminated its order of dependency and Rosario obtained legal custody over both children. CYS noted in a Family Service Plan Review that Rosario had completed all reunification goals, but Billups could not do so because of his incarceration.

After a week-long trial held in December 2010, Billups was acquitted of all charges and released from custody. Three days after he returned home, CYS opened a general protective services case because of the previously issued no-contact order against Billups. As a result, Defendants Kari Coccagna and Minnie Turner (both CYS employees) issued a Family Service Plan to the parents that, along with certain other reunification goals, required them to comply with a related Safety Plan. This Safety Plan prevented Billups from having unsupervised contact with the two children, but was revised in February 2011 to permit him limited unsupervised contact with L.B. and T.R. The revised Safety Plan was lifted in May 2011, and the CYS case was closed approximately one month later.

The four family members (collectively, Plaintiffs) sued the Medical and County Defendants, alleging, among other things, violations of procedural and substantive due

3

process. *See* 42 U.S.C. § 1983. After the parties filed cross-motions for summary judgment, the Magistrate Judge recommended that the District Court grant Defendants' motions. Despite Plaintiffs' objections, the District Court agreed with the Magistrate Judge, and this timely appeal followed.

## II[1]

### A

We begin with the claims against the County Defendants. The crux of Plaintiffs' appeal is that the County Defendants violated their substantive due process rights by coercing them into signing the Safety Plan. In their view, Billups' acquittal and the medical expert testimony at his trial put CYS on notice that "there was no imminent risk to the children." Plaintiffs' Br. 24. By "fail[ing] to consider this new information," CYS acted in an arbitrary fashion when it decided to implement the Safety Plan. *Id.* at 25.

Assuming Plaintiffs made the "threshold" showing that the County violated an interest protected by the Fourteenth Amendment, *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139–40 (3d Cir. 2000), they failed to demonstrate that the CYS caseworkers acted with the type of arbitrariness or gross negligence that shocks the conscience, *Miller v. City of Philadelphia*, 174 F.3d 368, 375–76 (3d Cir. 1999) (applying this standard to social workers involved in child abuse investigations and noting that such social workers

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over summary judgments. *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 436 (3d Cir. 2004). "In doing so, we assess the record using the same summary judgment standard that guides the district courts." *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004).

"rarely will have the luxury of proceeding in a deliberate fashion"). Like the District Court, we agree with the Magistrate Judge's determination that Billups' acquittal "d[id] not simply negate the juvenile court's prior finding, under the less burdensome clear and convincing evidence standard, that Billups had abused L.B." App. 43. The previous dependency adjudication provided CYS with "reasonable and articulable evidence giving rise to a reasonable suspicion that [T.R. or L.B.] ha[d] been abused or [were] in imminent danger of abuse." *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997). Therefore, the District Court did not err when it concluded that CYS's decision to implement further remediation measures did not shock the conscience.

Plaintiffs also contend that the Safety Plan deprived them of procedural due process because it did not include a notice of their right to appeal, and Turner and Coccagna failed to advise them of that right. The County Defendants claim the dependency proceeding, at which Rosario and Billups were represented by counsel, provided them with adequate process. Like the Magistrate Judge and District Court, we agree with the County.

As the Magistrate Judge explained, determining whether Plaintiffs were afforded adequate process involves balancing "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The Magistrate Judge

5

weighed the parents' essential interest in the custody of their children against the government's interest in protecting children from abuse. He also discussed the process Billups received during the adversarial dependency hearing, including the ability to testify, cross-examine witnesses, and produce evidence. Finally, he correctly noted that the dependency hearing and the Safety Plan concerned "the very same factual issue," App. 46, such that the additional procedures would have amounted to a "second juvenile court hearing to reconsider the juvenile court's original decision" that "would impose significant costs and administrative burdens on both the government and the plaintiffs," App. 48. Aside from stating (without support in the record)[2] that this conclusion was incorrect,[3] Plaintiffs offer no persuasive argument for reversing this well-reasoned analysis. Accordingly, we will affirm.

---

[2] Plaintiffs cite language in a sealed opinion of the Pennsylvania Commonwealth Court to support their argument that the dependency proceeding did not provide them with adequate process. They presented this opinion to the District Court after the Magistrate Judge had issued his report and recommendation. The District Court declined to consider the opinion, correctly noting that the argument was untimely.

[3] Plaintiffs argue that Pennsylvania now requires notice and an opportunity to be heard "any time a separation occurs within the family," including where the Commonwealth limits a parent's contact with his child. Plaintiffs' Br. 19 (citation omitted). According to Plaintiffs, this indicates that inadequate process existed in 2010. But we are not bound by Pennsylvania's interpretation of what due process requires. *United States v. Bedford*, 519 F.2d 650, 653 n.3 (1975) ("It is a recognized principle that a federal court is not bound by a state court's interpretation of federal law . . . ."). And the Commonwealth's decision to mandate additional procedures does not determine whether its earlier policy complied with the Fourteenth Amendment.

B

We now consider Plaintiffs' claims against the Medical Defendants. They insist the Medical Defendants violated their substantive due process rights by allegedly misrepresenting that the treatment team had considered and rejected thrombosis and metabolic bone disease, both of which could have explained L.B.'s symptoms. According to Rosario and Billups, these misrepresentations led to the loss of custody over their children and the institution of criminal charges against Billups. But even assuming that the Medical Defendants qualify as state actors for Fourteenth Amendment purposes, the two statements and one omission identified by Plaintiffs do not implicate the protections afforded by substantive due process.

First, Plaintiffs point to the statement in Defendant Dr. Kathryn Crowell's 2009 consult report that "[t]here was no metabolic cause identified for [L.B.'s] bleed. She does not have any evidence of coagulopathy or bleeding disorder." App. 968. According to Plaintiffs, "coagulopathy" refers to bleeding disorders involving impaired coagulation or excessive bleeding, as well as to clotting disorders involving excessive coagulation, including thrombosis. Therefore, they contend that this statement misrepresented that the treatment team had specifically tested for and ruled out thrombosis, the symptoms of which could mimic those of child abuse.

Even if we were to accept Plaintiffs' definition of "coagulopathy," they have not presented evidence from which we can infer that Dr. Crowell acted with deliberate indifference to a resulting harm. *See Nicini v. Morra*, 212 F.3d 798, 812 (3d Cir. 2000) (en banc). Nor do they demonstrate that Crowell "consciously disregarded, not just a

7

substantial risk, but a *great* risk that serious harm would result." *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002) (emphasis added). For instance, Plaintiffs do not cite any evidence indicating that their broad definition of coagulopathy, which encompasses both clotting and excessive bleeding disorders, was of such common usage in the medical field that the word would inexorably lead to the "reasonable conclusion [that the doctors] had tested for any potential 'mimic' of abuse," including thrombosis. Plaintiffs' Br. 34. They do not identify any HMC policies demonstrating that coagulopathy screenings routinely involve testing for both types of disorders. Nor do they present evidence that CYS or the local police specifically interpreted Crowell's "coagulopathy" statement to mean that the team had tested for thrombosis and excluded it as an alternative explanation for L.B.'s injuries. For these reasons, Plaintiffs cannot make out a substantive due process claim based on this statement.

Second, Plaintiffs point to an alleged misstatement in the same report that "[L.B.'s] initial coags were normal," App. 967, when they showed slightly low levels of a specific clotting agent. But the test results changed over the course of testing and merely indicate that at some point L.B. was clotting too slowly. In any event, Plaintiffs do not explain how the misstatement supports the argument that the Medical Defendants represented that they had ruled out excessive-clotting disorders as potential explanations for L.B.'s injuries.

Finally, Plaintiffs point to the omission from Dr. Crowell's report of an impression made by Defendant Dr. Arabinda Choudhary, where he noted that a lack of blood flow to L.B.'s cortical bridging veins was "likely due to compression from hematoma, edema of

8

[the] brain and less likely thrombosis." App. 964. Once again, they have pointed us to no evidence that establishes the type of deliberate indifference or gross negligence that shocks the conscience. *Cf. Croft*, 103 F.3d at 1126–27 (finding that a social worker violated substantive due process rights when she removed a father from the family home based on a "six-fold hearsay report," no objective physical evidence of abuse, and no personal belief that abuse had occurred). By contrast, the Medical Defendants argue that Choudhary informed Crowell before she drafted her report that he did not think that thrombosis explained the findings, which would account for the omission from her report. They also note that HMC sent Choudhary's report containing the statement about thrombosis to CYS, who in turn conveyed it to the police, so it is unclear how this omission had any influence on the subsequent investigations. Plaintiffs neither respond to these arguments in their reply brief, nor cite any evidence in the record to dispute these facts. Accordingly, they cannot prevail.[4]

## III

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[4] Plaintiffs argue that the Medical Defendants changed their explanations for L.B.'s symptoms over the course of the investigation. They assert that this indicates that the Medical Defendants realized they had violated Plaintiffs' rights. The Magistrate Judge did not address this argument in his report and recommendation, and Plaintiffs do not argue that they included this omission in their objections. Accordingly, the District Court did not err in failing to consider it. *See, e.g.*, *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). In any event, this argument boils down to an attempt by Plaintiffs to revive their previous claim, dismissed at the 12(b)(6) stage, that the Medical Defendants should have conducted a thrombophilia workup.